UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

MUENCH PHOTOGRAPHY, INC.,

                    Plaintiff,

-against-                                          12 Civ. 6595 (LAP)

McGRAW-HILL GLOBAL EDUCATION                       <u>MEMORANDUM AND ORDER</u>
HOLDINGS, LLC AND McGRAW-HILL
SCHOOL EDUCATION HOLDINGS, LLC,

                    Defendants.


LORETTA A. PRESKA, Senior United States District Judge:

     Plaintiff Muench Photography, Inc. ("Plaintiff") filed this

action for breach of contract and copyright infringement against

Defendants McGraw-Hill Global Education Holdings, LLC and

McGraw-Hill School Education Holdings, LLC ("Defendants" or

"McGraw-Hill").  The parties signed an agreement stipulating to

the dismissal of Plaintiff's breach of contract claims [dkt. no.

109-2].  Before the Court are the parties' Proposed Findings of

Fact and Conclusions of Law with respect to the outstanding

copyright infringement claims.  (Defendants' Proposed Findings

Of Fact And Conclusions Of Law ("Def. Br."), dated Sep. 12, 2018

[dkt. no. 105]; Plaintiff's Response To Defendants' Proposed

Findings Of Fact And Conclusions Of Law And Plaintiff's Proposed

Findings Of Fact And Conclusions Of Law ("Pl. Br."), dated Sep.

21, 2018 [dkt. no. 108]).

The Court has previously informed the parties that it will construe these papers as motions for summary judgment on Plaintiff's copyright claims under Federal Rule of Civil Procedure 56.  For the following reasons, Defendants' motion for summary judgment is granted, and Plaintiff's motion is denied.

I.   Background

McGraw-Hill is a publisher of textbooks and educational products for pre-kindergarten through college and post-graduate courses.  (Def. Br. at 1).  Plaintiff is a California-based stock photography agency that licenses photographs created by professional photographers David Muench and Marc Muench.  (Pl. Br. at 21).  Plaintiff entered into a stock photo representation agreement with Corbis, a stock photo agency, authorizing Corbis to license Muench's photographs to others, including publishers like McGraw-Hill.  (Def. Br. at 1).

Corbis (and The Stock Market ("TSM") before it) and McGraw-Hill entered into several written agreements, including:

> a. An agreement entitled "McGraw-Hill Higher Education Volume Pricing Agreement (Dubuque and Burr Ridge)," dated November 20, 2000 (the "2000 Higher Ed Rate Card"), which established the license fees and conditions between McGraw-Hill's Higher Education division and Corbis, as of at least November 20, 2000. Appendix in Support of MHE's Pre-Motion Conference on Motion for Summary Judgment ("Def. Appendix"), dated

Aug. 21, 2018 [dkt. no. 104-4], Ex. 4,
(Roerig-Blong Decl.) ¶ 5; id., Ex. A;

    b. An agreement entitled "Textbook
rates Glencoe valid through 5-1-2001," which
established the license fees and conditions
between McGraw-Hill's School Group division
and TSM, as of at least June 29, 2000. Def.
Appendix, Ex. 3 (Norton Decl.) ¶ 4; id., Ex.
A;

    c. An agreement entitled "Special
Volume-Based Pricing Agreement," effective
January 1, 2003 (the "2003 PPA"), which
established the license fees and conditions
between McGraw-Hill and Corbis as of January
1, 2003. Def. Appendix, Ex. 2 (Spelman
Decl.), Ex. A; Ex. 3 (Norton Decl.) ¶ 5; Ex.
4 (Roerig-Blong Decl.) ¶ 7;

    d. An agreement entitled "Special
Volume-Based Pricing Agreement," effective
May 1, 2006 (the "2006 PPA"), which
established the license fees and conditions
between McGraw-Hill and Corbis as of May 1,
2006. Def. Appendix, Ex. 1 (Beacher Decl.),
Ex. B; Ex. 2 (Spelman Decl.) ¶ 5; Ex. 3
(Norton Decl.) ¶ 6; Ex. 4 (Roerig-Blong
Decl.) ¶ 8;

    e. An agreement entitled "Preferred
Pricing Agreement" effective February 27,
2009 ("2009 PPA"), which established the
license fees and conditions between McGraw-
Hill and Corbis as of February 27, 2009.
Def. Appendix, Ex. 1 (Beacher Decl.), Ex. C;
Ex. 2 (Spelman Decl.), Exs. B, C, D; Ex. 3
(Norton Decl.) ¶ 7; Ex. 4 (Roerig-Blong
Decl.) ¶ 9; and

    f. An agreement entitled "Preferred
Pricing Agreement" effective April 1, 2014
("2014 PPA"), which established the license
fees and conditions between McGraw-Hill and
Corbis as of April 1, 2014. Def. Appendix,
Ex. 2 (Spelman Decl.), Ex. E; Ex. 3 (Norton
Decl.) ¶ 8; Ex. 4 (Roerig-Blong Decl.) ¶ 10.

(Def. Br. at 3-5).

Limits on the licenses that Corbis issued to McGraw-Hill are stated in the Corbis Corporation Invoice and License Agreements.  (Plaintiff's Appendix ("Pl. Appendix"), dated Sep. 21, 2018 [dkt. no. 107], Ex. 3).

Between 2001 and 2009, Corbis issued one-time, limited licenses to McGraw for use of Muench's photographs in McGraw publications.  (Pl. Br. at 23).  Under the relationship between McGraw-Hill and Corbis (and The Stock Market as a predecessor entity in interest), McGraw-Hill obtained thousands of photos, including Muench's photos, for use in its educational textbook programs. Throughout this relationship, Corbis provided, or allowed, unrestricted access to transparencies or high-resolution files of photos as part of McGraw-Hill's editorial process to incorporate those photos in the textbook programs. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 8; Ex. 3 (Norton Decl.) ¶¶ 10-12; Ex. 4 (Roerig-Blong Decl.) ¶¶ 12-14.  (Def. Br. at 5).

Consistent with its relationship with Corbis, and with the textbook industry's custom and practice, McGraw-Hill understood that it obtained permission to use photos when it received the photos from the agency, either in transparency or digital format or, later in the 2000s, through direct access from the Corbis website. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 7-8; Ex. 3

(Norton Decl.) ¶ 15; Ex. 4 (Roerig-Blong Decl.) ¶ 17.  (Def. Br. at 5).

Once McGraw-Hill decided to use a photo from Corbis's collection, it sent a request for invoicing to Corbis, providing information about McGraw-Hill's anticipated use of the photos, typically including the anticipated print run, geographic distribution, language(s), and format(s) of the textbook that would likely contain the selected photo. Def. Appendix, Ex. 2 (Spelman Decl. ¶¶ 7-9); Ex.3 (Norton Decl.) ¶ 19; Ex. 4 (Roerig-Blong Decl.) ¶ 17.  (Def. Br. at 5).

McGraw-Hill asserts that its invoice requests typically assumed that permission already existed for use of the specified photos because these photos had already been obtained from the agency and because the parties already had pricing agreements to cover the anticipated use of the photos. Def. Appendix, Ex. 2 (Spelman Decl. ¶¶ 7-9); Ex. 3, (Norton Decl.) ¶ 18; (Roerig-Blong Decl.) ¶ 20. McGraw-Hill's invoice request documents merely requested that the agency issue an invoice pursuant to the pricing parameters established in the parties' pricing agreements. (Def. Br. at 6).

In response to McGraw-Hill's invoice requests, Corbis would send invoices indicating the price to be paid by McGraw-Hill for the anticipated use. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 8;

Ex. 3 (Norton Decl.) ¶ 19; Ex. 4 (Roerig-Blong Decl.) ¶ 21.
(Def. Br. at 6).

McGraw-Hill typically sent invoice requests to Corbis prior
to publication; however sometimes the invoice requests were sent
after the initial publication. Def. Appendix, Ex. 2 (Spelman
Decl.) ¶¶ 14-15; Ex. 3 (Norton Decl.) ¶ 20; Ex. 4 (Roerig-Blong
Decl.) ¶ 22.  (Def. Br. at 6).  In such instances, McGraw-Hill
asserts that Corbis would issue "back-dated" invoices (i.e.,
acknowledging rights beginning prior to the invoice date).  Id.

McGraw-Hill did not understand the Corbis invoices to
impose limits on its permission to use the specified photos, but
rather to indicate the amount of use McGraw-Hill anticipated it
would make and the amount of money to be paid for that
anticipated use. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 9-10,
14; Ex. 3 (Norton Decl.) ¶ 21; Ex. 4 (Roerig-Blong Decl.) ¶ 23.

If McGraw-Hill exceeded the usage it had paid for to
Corbis, it understood that it should make an additional payment,
but that McGraw-Hill's additional use of the photo was not
barred - both under the PPAs and under the parties'
understanding, by McGraw-Hill's failure to pay for the
additional use in advance. Def. Appendix, Ex. 2 (Spelman Decl.)
¶ 14; Ex. 3 (Norton Decl.) ¶ 22; Ex. 4 (Roerig-Blong Decl.) ¶ 24

Steve N. Spelman, the Corbis executive responsible for Corbis' relationship with McGraw-Hill during much of the time period covered by Muench's claims, provided sworn testimony that "[m]y staff and I understood that any invoice that Corbis issued to McGraw-Hill was part of a larger, mutually beneficial relationship involving hundreds of transactions one after another, and all of those transactions were subject to the PPAs [Preferred Pricing Agreements] and the understandings that McGraw-Hill had developed during their years of doing business together." Def. Appendix, Ex. 2 (Spelman Decl.) at ¶¶ 7-14.

These successive pricing agreements and letter agreements, which were unbroken in duration from 2000 through the time period covered by Muench's claims, established the fees for different tiers of anticipated use, typically based on ranges of estimated print runs as well as other usage parameters falling within the agreed upon fees. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 7-14; Ex. 3 (Roerig-Blong Decl.) ¶ 11. (Def. Br. at 7).

The 2009 PPA established the pricing for uses beyond those originally anticipated, providing, "If McGraw-Hill desires to increase the total number of Unique Users after the initial license for such Image is granted, McGraw-Hill may re-license such Image . . . . McGraw-Hill acknowledges and agrees that

Corbis will re-license images to McGraw-Hill following any License Term provided that Corbis still retains the right to represent and license such images." Def. Appendix, Ex. 2 (Spelman Decl.), Ex. C. (Def. Br. at 7).

Even before the memorialization of this principle in the 2009 PPA, McGraw-Hill understood that any additional use of a photo beyond the use initially paid for through an initial invoice would be priced based on the difference between that original invoice price and the price set in the applicable preferred pricing agreement for the amount of usage that later occurred. Def. Appendix, Ex. 2 (Spelman Decl.) ¶¶ 9-10, 14; Ex. 3 (Norton Decl.) ¶¶ 22-23; Ex. 4 (Roerig-Blong Decl.) ¶¶ 24-25.

Also, as relevant here, the 2003 PPA established that "electronic usage was included in the prices to be paid by McGraw-Hill", which meant that "electronic use was always authorized by Corbis even if it was not listed in the particular invoice." Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 9. Similarly, the term of the invoice agreement was extended to the life of the program in this PPA. Def. Appendix, Ex. 2 (Spelman Decl. ¶ 10). According to Mr. Spelman, because the invoice form did not have an option for the employee at Corbis to enter a narrative stating as such, the Corbis employees were required to enter a number in the duration field, despite knowing and

acknowledging that the actual duration was for the "life of the program/edition." Id. The 2003 PPA also removed any price difference based on distribution so that there would be no extra cost to McGraw-Hill for distribution around the world. Id.; see also Def. Appendix, Ex. 3 (Norton Decl.) ¶ 24; Ex 4. (Roerig-Blong Decl.) ¶ 26.

The 2006 PPA stated that "all languages" would be included in the standard price paid by McGraw-Hill to Corbis for the usage of any particular image. Def. Appendix, Ex. 1 (Beacher Decl.), Ex. B. at p. 14.

The 2003, 2006, and 2009 PPAs each established tiers of pricing based on estimated print runs. Def. Appendix, Ex. 3 (Norton Decl.) ¶¶ 23-24; Ex. 4 (Roerig-Blong Decl.) ¶¶ 25-26. The highest tier in each agreement provided for an unlimited number of copies. Id.

For example, in the 2006 and 2009 pricing agreements, McGraw-Hill and Corbis agreed to a price for usage of "over 250,000" and "over 5,000,000" unique users respectively. Def. Appendix, Ex. 1 (Beacher Decl.), Ex. B at p. 14 ; Ex. 2 (Spelman Decl.), Ex. C at p. 3.

Further, the 2009 PPA contained an agreed upon "increased use" provision that allowed McGraw-Hill to print beyond the stated amount on the invoice and pay for the additional prints

9

later. Def. Appendix, Ex. 2 (Spelman Decl.) ¶ 14. This
"Increased Use" provision memorialized the parties' prior
practice that McGraw-Hill would make a payment to Corbis of "the
higher of either the increased difference in the pricing grid in
the PPA or $35" and "was a way of maintaining the mutually
beneficial relationship between McGraw-Hill and Corbis." Id.

Pursuant to the parties' agreements providing a pricing
level for an unlimited number of copies that could be
distributed anywhere in the world, McGraw-Hill understood that
the pricing agreements ensured that McGraw-Hill could use Corbis
photos in unlimited numbers, subject to an obligation to pay
Corbis for such usage at the price level for the maximum tier of
unlimited use set by the applicable pricing agreement. Def.
Appendix, Ex. 2 (Spelman Decl.) ¶¶ 9-10, 12-14; Ex. 3 (Norton
Decl.) ¶ 24; Ex. 4 (Roerig-Blong Decl.) ¶ 26.  (Def. Br. at 9).

The latest agreement, the 2014 PPA, explicitly provided
that the price McGraw-Hill paid per photo would include
worldwide distribution, printing in all languages, and a
duration that would last the life of the program. Def. Appendix,
Ex. 2 (Spelman Decl.), Ex. E.  The first and only pricing tier
listed on the 2014 PPA provided a pricing amount "for print
runs/Unique users over 250,000."  Id.

At no time did Corbis refuse McGraw-Hill's request for a non-exclusive license for any image that the agency was authorized to represent. Roerig-Blong Decl. ¶¶ 26-27; Norton Decl. ¶¶ 25-26.  (Def. Br. at 9).

## II.  LEGAL STANDARD

Summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  A fact is material if it "might affect the outcome of the suit under the governing law." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  A dispute is genuine if, considering the record as a whole, a rational jury could find in favor of the non-moving party.  Ricci v. DeStefano, 557 U.S. 557, 586 (2009).  Summary judgment may be granted only if "no reasonable trier of fact could find in favor of the nonmoving party."  Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995).

On summary judgment, the party bearing the burden of proof at trial must provide evidence on each element of its claim or defense. Celotex Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  "If the party with the burden of proof makes the requisite initial showing, the burden shifts to the opposing party to identify specific facts demonstrating a genuine issue for trial, i.e., that reasonable jurors could differ about the evidence."

Clopay Plastic Prods. Co. v. Excelsior Packaging Grp., Inc.,
2014 WL 4652548, at *3 (S.D.N.Y. Sept. 18, 2014) (citing Fed. R.
Civ. P. 56(c); Anderson, 477 U.S. at 250-51). The court views
all "evidence in the light most favorable to the non-moving
party," and summary judgment may be granted only if "no
reasonable trier of fact could find in favor of the nonmoving
party." Allen v. Coughlin, 64 F.3d 77, 79 (2d Cir. 1995) (second
quoting Lunds, Inc. v. Chem. Bank, 870 F.2d 840, 844 (2d Cir.
1989)).

III. DISCUSSION

Plaintiff argues that its remaining claims sound in
contract, not copyright, while Defendants argue the reverse.
(Pl. Br. at 32). Defendants characterize the usage terms in the
agreements between Corbis and Defendants as contractual
covenants and not conditions precedent. (Def. Br. at 10). The
reason the characterization is dispositive is because the Court
of Appeals in Graham v. James held, "[g]enerally, if the
licensee's improper conduct constitutes a breach of a covenant
undertaken by the license . . . and if such covenant constitutes
an enforcible contractual obligation, then the licensor will
have a cause of action for breach of contract, not copyright
infringement." Graham v. James, 144 F.3d 229, 236 (2d Cir.
1998) (alterations and quotation marks omitted). Both parties

cite to the holding in Graham.   (Def. Br. at 10; Pl. Br. at 32).

It is therefore confusing when Plaintiff says, "[w]e need not

labor here to decipher the distinctions between 'covenants' and

'conditions.'"   (Pl. Br. at 35).   This is exactly what the Court

must do.   For the following reasons, the the Court agrees with

Defendants' characterization, adopting the reasoning articulated

in Sohm v. Scholastic, 2018 WL 1605214, at *12 (S.D.N.Y. Mar.

29, 2018).   Accordingly, Defendants' motion for summary judgment

is granted, and Plaintiff's motion for summary judgment is

denied.

State law governs the interpretation of a licensing

contract, and the parties here argue on the basis of New York

law.   Sohm, 2018 WL 1605214, at *12.   In finding the existence

of a condition precedent, "[w]hile specific, talismanic words

are not required, the law nevertheless demands that conditions

precedent be 'expressed in unmistakable language.'"   Bank of

N.Y. Mellon Tr. Co. v. Morgan Stanley Mortg. Capital, Inc., 821

F.3d 297, 305 (2d Cir. 2016) (quoting Oppenheimer & Co. v.

Oppenheim, Appel, Dixon & Co., 86 N.Y.2d 685, 691 (1995)).   "The

New York Court of Appeals has defined a condition precedent as

'an act or event, other than a lapse of time, which, unless the

condition is excused, must occur before a duty to perform a

promise in the agreement arises.'"   Tangorre v. Mako's, Inc.,

2003 WL 470577, at *6 (S.D.N.Y. Jan. 6, 2003) (quoting

Oppenheimer, 86 N.Y.2d at 690).  In contrast, "contract
obligations that are to be performed after partial performance
by the other party are not treated as conditions." Graham, 144
F.3d at 237.  Contract terms that merely delineate "acceptable"
and "unacceptable" behavior under the licensing agreement are
covenants.  Sohm, 2018 WL 1605214, at *12 (citation omitted).

Plaintiff begins by averring "the Graham court did not
address a key exception to the condition/covenant principle: a
copyright holder cannot sue a licensee for copyright
infringement when the licensee is acting within the scope of the
license, if, however, a license is limited in scope and the
licensee acts outside the scope, the licensor can bring an
action for copyright infringement."  (Pl. Br. at 33) (citations
omitted).  The Court has read Graham and disagrees with
Plaintiff's characterization of the case.  The Court of Appeals
specifically said, "What is disputed here is the scope of the
license and how long the license lasted . . . when the contested
issue is the scope of a license, rather than the existence of
one, the copyright owner bears the burden of proving that the
defendant's copying was unauthorized under the license. . . the
burden was on . . . the copyright owner to show that the
allegedly infringing acts were not allowed by the license."
Graham, 144 F.3d at 236 (emphasis added).  Not only did the
Graham court address the key exception, it placed the burden on

14

the plaintiff to prove the infringing acts were not allowed by the license.

Plaintiff tries to distinguish Graham, which classified the obligations in that case as covenants, on the grounds that the payments in that case involved "failure to pay royalties, not use after exhaustion of a license." (Pl. Br. at 32). The underlying principle, however, is the same. The dispute in Graham was over a license relating to the sale of a particular software version. Graham, 144 F.3d at 232. "[T]he district court could not have found that [defendant] infringed [plaintiff's] copyright unless the licensing agreement already had been rescinded." Id. at 236.

In discussing rescission of the agreement, the Court of Appeals found it relevant that the district court awarded the plaintiff breach of contract damages. Id. In the instant case, the parties have stipulated to a breach of contract on another set of claims. While this is not proof in itself, it belies Plaintiff's characterization of the relationship as one between "strangers." (Pl. Br. at 35).

The Court of Appeals held in Graham that in addition to nonpayment of royalties, removing the copyright notice also did not constitute a breach of a condition precedent. Graham, 144 F.3d at 236. What the Court takes from this holding is that

15

there are a host of actions that on first blush may appear as outside of the scope of the license but are nonetheless within the scope of the license.

Plaintiff asserts that Defendants "never had any authorization to make the uses at issue here." (Pl. Br. at 33). This may be colloquially true, but it proves too much – Defendants, when they delayed sending their invoice requests, were also acting without "authorization." (Def. Br. at 6). But this was part of the dealings of the parties, and these lapses do not amount to an expiration of a license and copyright violation. As Defendants point out, "the [agreements] make clear the understanding between Corbis and McGraw-Hill: the parties had already agreed to a regime of various pricing levels based on the range of possible uses of the photos." (Pl. Br. at 14).

The court in Sohm, dealing with identical language, found that the relevant claims sounded in contract and not copyright. Sohm, 2018 WL 1605214, at *14. The relevant language to the instant case appears in the Licensing Terms and Conditions:

> Unless otherwise specified in a separate writing signed by Corbis, your reproduction of Images is limited to. . .the specific use described in your invoice, which together with these terms shall constitute the full license granted.... Any license granted by Corbis is conditioned upon (i) your meeting all conditions and restrictions imposed by Corbis, and

16

(ii) Corbis' receipt of full payment by you for such
use as invoiced by Corbis. Your failure to make full
payment when due shall terminate any license granted
to you and entitles Corbis to pursue all remedies
available under copyright or other applicable laws.
You may not otherwise make, use or distribute copies
of any Images for any purpose except as authorized.

[dkt. no. 104-1 at 11, 19]

As the court put it in Sohm, Defendants' license "was
conditional on full payment as invoiced." Sohm, 2018 WL
1605214, at *13. As in that case, there was no failure here to
pay as invoiced, rather there was a deficiency with the
invoicing, i.e, there was an ex post exceeding of the terms
permitted under the license invoices. This exceeding "is better
understood as a violation of the provision prohibiting [the
Defendant] from 'making, using or distributing copies of any
Images for any purpose except as authorized,'" and not as a
condition precedent. Id. at *13 (alterations omitted).
Further, the court characterized breaching the limit on
defendant's "reproduction of images to the specific use
described in your invoice" as merely delineating acceptable and
unacceptable behavior under the licensing agreement and
therefore a covenant. Id.

Plaintiff also addresses the "ten-times" provision which
provides, "Corbis in its sole discretion reserves the right to
bill [Defendants] . . . ten times the normal license fee for any

17

unauthorized use." [dkt. no. 104-1 at 11, 19]. Plaintiff argues that "[t]he presence of a damages provision to calculate a fee in the event McGraw ignored the license limits does not undo the other terms in this agreement that make it clear that the license granted was restricted to the uses on the invoice." (Pl. Br. at 38). There is no citation for this proposition, and the Court does not agree with it. That the 2009 PPA included an increased use provision, but not a ten-times provision, is instructive. (Pl. Br. at 38). It demonstrates that the ten-times provision covered the same ground as the increased use provision, i.e., to address situations where there was an ex post desire on the part of Defendants to increase the total number of unique users. As discussed below, this ex ante contemplation of exceeding uses shows that the parties believed that royalty payment and proper invoicing could remedy any unauthorized uses.

Plaintiff is asserting that it is McGraw-Hill's lack of precision in their invoices that created the copyright claim. But this lack of precision is better characterized as breaching a covenant, and the cases cited by Plaintiff support such a characterization.

Plaintiff cites to Spinelli v. National Football League, where the Court of Appeals found that photographers' claims

against the National Football League (the "NFL") sounded in copyright and not contract law.  Spinelli v. Nat'l Football League, 903 F.3d 185, 202 (2d Cir. 2018).  In Spinelli, plaintiffs contracted with the Associated Press to re-license their photos, just like instant Plaintiff contracted with Corbis.  The license that the plaintiffs gave to the AP in that case did not permit the complimentary sublicense the AP gave the NFL.  "Because Plaintiffs are claiming that AP acted outside the scope of its license, they properly claim copyright infringement, not breach of contract."  Id. at 202.  For Plaintiff's purposes, this tracks nicely the "act[ing] outside the scope" of the license language that Plaintiff uses to describe McGraw-Hill's behavior.  (Pl. Br. at 32).  The trouble with this analogy is that it there are degrees to which a party can act outside of the scope of a license.

The Court of Appeals recognized as much.  In a relevant footnote cited by neither Plaintiff nor Defendants, the Court of Appeals goes on to say, "We in no way suggest that a plaintiff can proceed on a copyright infringement claim simply by repackaging a claim for royalties as a claim that the alleged infringer exceeded the scope of a licensing agreement. In most cases, a sale or sublicense triggers a clearly applicable royalty obligation in a licensing agreement, and the remedy is a contractual one for payment of the specific royalty amount that

the agreement provides. That is not the case here." Spinelli, 903 F.3d at 202 n.7.

But it is the case here.  There was clearly a payment triggered that should have been invoiced properly, and as Defendants point out, Corbis never refused one of Defendants' requests.  (Def. Br. at 9).  This makes this case different from Spinelli where the NFL had no such agreement and could not remedy with the correct invoice and royalty payment as instant Defendants could.  Cf. Spinelli, 903 F.3d at 196.  ("AP had already granted a complimentary license to the NFL before it sought amendments to its contracts with Plaintiffs that would permit AP to do so.")  To classify the instant case as an unauthorized use, is exactly the kind of repackaging the Court of Appeals cautioned against.

It is certainly the case that, at least colloquially, any covenant breacher is acting "outside the scope" of the contract – but as has been said, in a precise legal sense, not all "unacceptable" behavior according to the terms of a contract is outside its scope as a matter of law.  Sohm, 2018 WL 1605214, at *13.  The parties had certainly contemplated overusage, as evidenced by the 2009 PPA's increased use provision that allowed McGraw-Hill to print beyond the stated amount on the invoice and pay for the additional prints later.  (Def. Br. at 9).

Plaintiff counters that the "increased use" provision was subject to a re-license of the photograph for an additional fee. (Pl. Br. at 38).  But Plaintiff does not cite a crucial word in that provision.  The 2009 PPA states, "If [McGraw-Hill] desires to increase the total number of Unique Users after the initial license for such Image is granted, MHE <u>may</u> re-license such Image, however, the additional fee will be the greater of [certain pricing terms]."  (Pl. Appendix Ex. 2 at 24) (emphasis added).  The relevant word here is "may."  This makes this case different from <u>Spinelli</u> in that it was up to McGraw-Hill if it wanted to "re-license," whereas in <u>Spinelli</u>, the NFL was acting outside the scope of any agreement.

In the language of the Court of Appeals, this "re-license," is really a repackaged "clearly applicable royalty obligation" in a licensing agreement.  There is no separate license truly considered, but rather what is contemplated is a royalty payment that can remedy the problems caused in the first license.  Had Corbis ever turned down a McGraw-Hill request, that would lend support to the idea that the "re-license" was something more than a mere <u>pro forma</u> curative royalty payment.  But Corbis never turned down such a request.  (Def. Br. at 9).

In the instant case, not only did the agreement permit the usage, but this was the whole point of the contract.  That the

terms of the contract were exceeded does not mean that this case is analogous to Spinelli where the usage of the relevant photos was effected by a unilateral decision on the part of the AP who was acting beyond what the photographers and the contract contemplated.

There is a similar gulf between this case and Kamakazi Music Corp. v. Robbins Music Corp., 684 F.2d 228 (2d Cir. 1982). In that case there was a contract that had expired between the parties, id. at 230, so there was no contract at the relevant time.  Here the issue is overusage in an agreement where such overusage is contemplated both by the explicit language of the contract as well as past dealings between the parties.

These past dealings are not meant to imply that industry practice can supplant federal copyright law.  Cf. Palmer/Kane LLC v. Rosen Book Works LLC, 204 F. Supp. 3d 565, 575 (S.D.N.Y. 2016).  In Palmer, the licenses' one-year term had expired, which established the basis for the copyright violation. Palmer, 204 F. Supp. 3d at 580.  Here, however, Defendants' payments and proper invoicing under the existing contract would have remedied the breach.  The past dealings are meant to show that, unlike in Palmer, there is no "pre-license" claim here, but rather a license whose terms specifically contemplate its own extension through a royalty payment.  This comports with the

Court of Appeals' saying that "[i]n most cases, a sale or sublicense [that] triggers a clearly applicable royalty obligation in a licensing agreement" should sound in contract, not copyright.  Spinelli, 903 F.3d 202 n.7.

Plaintiff's attempt at distinguishing Sohm is equally unavailing.  Plaintiff says that the agreement in that case was based on "entirely different volume-based pricing agreements, to which McGraw was not a party." (Pl. Br. at 39).  The agreements are not "entirely different," but rather contain identical relevant language that was cited by the court as dispositive.  Sohm, 2018 WL 1605214, at *13.  Plaintiff tries to distinguish this identical language by saying "the pricing agreements in Sohm were never publicly filed, and Scholastic never revealed any of their specific terms." (Pl. Br. at 39).  It is never explained why being publicly filed or having a certain degree of specificity of terminology is relevant to the holding of the case.

Plaintiff makes an analogy helpful to demonstrating the flaw in its argument.  Plaintiff says that the licenses were "for one-time use, and were self-expiring, like a prepaid phone card." (Pl. Br. at 34).  The argument goes that Defendants purchased a phone card with a definitive number of minutes on it and then went over their minutes.  In going over their

"minutes," i.e., authorized uses of the photos, Defendants breached a condition precedent to the contract and became a "stranger to the plaintiff-licensor." (Pl. Br. at 35).

The reason the phone card analogy fails is that it casts the agreements here in too rigid a light. If a phone card has a definitive number of minutes on it and those minutes are used up, then the phone card will cease to work. The agreement here specifically contemplates a range of uses. The nature of this agreement was such that the phone card Plaintiff purchased did not contain a definite number of minutes, but rather a range with flexibility that had been negotiated and refined through practice.

Clearly McGraw-Hill was not a stranger to Corbis. Their relationship did not cease with any violation of the license. Under Plaintiff's reading, the delay in sending the invoices would also make McGraw-Hill a stranger to the contract. The Court declines to adopt this literalist reading.

The above analysis, in conjunction with New York's "presumption favoring covenants over conditions," points to classifying the payment terms of the agreement as covenants. Graham, 144 F.3d at 237 (2d Cir. 1998).

IV.   CONCLUSION

For the reasons stated above, Defendants' motion for
summary judgment [dkt. no. 105] is granted.  Plaintiff's
Findings of Fact and Conclusions of Law [dkt. no. 108], which
the Court in construes as a motion for summary judgment, is
denied.  The Clerk of Court shall enter a judgment for
Defendants.

SO ORDERED.

Dated:    New York, New York
          February __/__, 2019

_____
LORETTA A. PRESKA
Senior United States District Judge